UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Amanda Shane, in her individual capacity and as successor in interest for Decedent Isaiah Shane,<br><br>                                    Plaintiff,<br><br>v.<br><br>County of San Diego et al.,<br><br>                                    Defendants. | Case No.: 22cv1309-JO-AGS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART SOCIAL WORKER DEFENDANTS' MOTION TO DISMISS ON BASIS OF QUALIFIED IMMUNITY** |

Isaiah Shane died from an accidental drug overdose while in state custody at a group home. His mother, Plaintiff Amanda Shane, alleges that County social workers failed to provide him with adequate treatment and supervision for his well-documented problems with drug abuse and mental health. She brought a 42 U.S.C. § 1983 action against various County social workers alleging (1) violation of Isaiah's Fourteenth Amendment right to adequate safety, security, supervision, and care as a foster child ("Claim 1"); (2) violation of his right to be free from state-created dangers ("Claim 2"); and (3) violation of his right to a proper foster child case plan under the Adoption Assistance and Child Welfare Act of 1980 ("Claim 3"). Dkt. 10 ("FAC").

On November 9, 2022, these County social workers, Evelyn Gorospe, Ariel Pearson, Natania Cibrian, Thomas Ruff, Kymberlee Watson, and Kristin Niemann (collectively, "Social Worker Defendants"), moved to dismiss the Section 1983 claims arguing that they are entitled to qualified immunity. Dkt. 24. The Court held oral argument on the motion on April 19, 2023. For the reasons stated below, the Court denies qualified immunity for Social Worker Defendants on Claim 1 and grants qualified immunity on the remaining Claims 2 and 3.

## I. BACKGROUND

Plaintiff's son Isaiah suffered from mental health and drug abuse problems from a young age. Isaiah first exhibited behavioral problems in middle school and was diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder. FAC ¶¶ 64–65. By tenth grade, Isaiah was running away from home, getting suspended, fighting with security, and having run-ins with the police. *Id.* ¶¶ 68–70. He began to experiment with drugs such as Xanax at fifteen years old. *Id.* ¶ 69.

In March 2020, the County became involved in Isaiah's care due to his mental health and drug abuse problems. On March 10, 2020, Isaiah was violent towards Plaintiff. *Id.* ¶ 76. The police took Isaiah into custody and determined he was under the influence of drugs. *Id.* Isaiah was hospitalized for a cocaine overdose and placed on an involuntary hold for a mental evaluation from March 11, 2020, to March 23, 2020. *Id.* During this period, County social workers investigated the situation. *Id.* ¶ 77. Although Plaintiff told the investigating social worker that Isaiah needed critical care in a residential treatment facility, the County still sent Isaiah home with Plaintiff upon his discharge from the hospital. *Id.* ¶ 77.

In September 2020, the County took custody of Isaiah due to his escalating need for professional mental health and drug treatment. On September 8, 2020, Isaiah was again violent towards Plaintiff and was placed on another involuntary medical hold. *Id.* ¶ 78. While Isaiah was in the hospital, Plaintiff told Evelyn Gorospe, the investigating social worker, about Isaiah's history of drug abuse, behavioral problems, and need for intensive

care. *Id.* ¶ 79. Plaintiff informed Ms. Gorospe that she could not take Isaiah home after the medical hold because he required professional mental health and drug treatment. *Id.* ¶ 83. Consequently, Ms. Gorospe took Isaiah into the custody of the County on September 9, 2020. *Id.* ¶ 83.[1]

Ms. Gorospe and her supervisor, Ariel Pearson, reviewed Isaiah's case file and records to determine his needs while in County custody. Records in the County's possession documented Isaiah's history of running away, substance abuse problems (including the March 2020 drug overdose), and mental health and behavioral issues. *Id.* ¶ 85. Ms. Gorospe noted in her September 11, 2020 detention report that Isaiah required drug treatment, mental health services, and close supervision to ensure his immediate safety. *Id.* ¶ 86.

Despite this knowledge of Isaiah's need for intensive drug treatment and supervision, Ms. Gorospe and Ms. Pearson placed Isaiah with a foster parent instead of a properly resourced secure residential treatment facility. *Id.* ¶ 87.[2] Isaiah continued to use drugs while placed with this foster parent, until this foster parent informed the County she could no longer keep Isaiah in her custody. *Id.* ¶ 89.

After this foster parent placement failed, social workers Thomas Ruff and Natania Cibrian arranged for Isaiah to live at Circle of Friends, a short-term residential therapeutic facility licensed by the County. *Id.* ¶ 90. During this time, Circle of Friends was at the center of public controversy—there had been numerous complaints of staff failures to properly supervise minors, and complaints of alcohol and drug use in the facility among the minors. *Id.* ¶¶ 93–94. Numerous phone calls to the police also indicated concerns of the care and supervision at Circle of Friends: from 2017 through 2021, the facility called

---

[1] The Juvenile Court entered a detention order on September 14, 2020 that confirmed the County's custody of Isaiah. FAC ¶ 84.

[2] In making these placements, Social Worker Defendants would recommend the placement to the juvenile court, which then ordered the placement based on their representations. *See* FAC ¶¶ 87–88, 96, 102, 112–113.

the police to request assistance with the children in their charge almost 350 times, including calls reporting runaway minors. *Id.* ¶ 95. Ms. Cibrian and Ms. Pearson were aware of Isaiah's history of running away, his substance abuse, and his mental health issues from his case file. *Id.* ¶ 91. Despite Isaiah's documented need for supervision and treatment for mental health and drug abuse, Mr. Ruff and Ms. Cibrian nevertheless placed Isaiah at Circle of Friends. *Id.* ¶ 96.

Isaiah's drug abuse problems worsened during his stay at Circle of Friends, which led to his placement at another foster home. On September 17, 2020, Isaiah entered Circle of Friends, where he was able to smuggle drugs and alcohol into the facility and continue his drug use. *Id.* ¶ 97. Circle of Friends staff informed Ms. Cibrian of Isaiah's drug use. *Id.* ¶¶ 98–100. Due to these issues, Ms. Cibrian and Mr. Ruff arranged for Isaiah to live in the home of Laura Henderson and her two sons, Harley and Cameron. *Id.* ¶ 102. Plaintiff alleges these social workers made this placement decision even though they knew Harley was a drug user who had used drugs with Isaiah in the past. *Id.* ¶¶ 102–103 Specifically, Plaintiff had told Ms. Cibrian that Isaiah and Harley had done drugs together, and that the Henderson home was a "drug house." *Id.* ¶¶ 102–106. Ms. Cibrian and Mr. Ruff also knew that Isaiah would be unsupervised during the day due to Ms. Henderson's work schedule, and so Harley, just twenty years old, would be Isaiah's primary caregiver. *Id.* ¶ 107. Even though they were aware of these risks, Ms. Cibrian and Mr. Ruff still placed Isaiah at the Henderson home on October 30, 2020, where he drank alcohol, left the home late at night unsupervised, and abused Xanax during his stay. *Id.* ¶¶ 108–111.

Eventually, on December 15, 2020, Ms. Cibrian, Mr. Ruff, and social workers Kymberlee Watson and Kristin Neimann recommended that Isaiah be placed back in Circle of Friends' custody. *Id.* ¶¶ 112–13. These social workers made this recommendation even though they were aware, based on Isaiah's previous stay, that the facility could not provide the level of care, intensive supervision, and drug treatment that Isaiah required for his mental health and drug abuse problems. *Id.* ¶ 114. Isaiah entered Circle of Friends on December 16, 2020. *Id.* During this second stay at the facility, Isaiah continued to abuse

drugs and access alcohol without any supervision, monitoring, or adequate rehabilitation or drug treatment. *Id.* ¶¶ 120–21. On May 3, 2021, while still at Circle of Friends, Isaiah accidentally overdosed on drugs and died. *Id.* ¶ 124.

## II. LEGAL STANDARD

Government officers sued under Section 1983 may be immune from civil liability under the doctrine of qualified immunity. Qualified immunity precludes liability if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this doctrine is to balance two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

To determine whether an officer is entitled to qualified immunity, the court considers two independent questions: (1) whether the officer's conduct violated a statutory or constitutional right, and (2) whether that right was "clearly established" at the time of the incident. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Stated another way, qualified immunity bars Section 1983 suits against a government officer when "either no deprivation of rights was alleged or the law dictating that specific constitutional [or statutory] right was not yet clearly established." *Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020) (citing *Pearson*, 555 U.S. at 236). Although qualified immunity is a two-step analysis, the court may analyze just the second step "when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan*, 991 F.3d at 1036. As to statutory rights, courts also look to whether "existing precedent must have placed the statutory[] question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017).

For the purposes of qualified immunity, a right is clearly established if "a reasonable officer would recognize that his or her conduct violates that right under the circumstances faced, and in light of the law that existed at that time." *Kennedy*, 439 F.3d at 1065 (citing

*Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) (citing *Wesby*, 138 S. Ct. at 590–91). The court need not, however, find "a prior case with identical, or even materially similar facts"; it is enough that "the preexisting law provided the defendants with fair warning that their conduct was unlawful." *Kennedy*, 439 F.3d at 1065 (internal quotations omitted). If a right is not clearly established, the defendant is entitled to qualified immunity. *Lawrence v. U.S.*, 340 F.3d 952, 956 (9th Cir. 2003). If the right is clearly established, the court determines "whether the defendant's conduct was 'objectively legally reasonable' given the information possessed by the defendant at the time of his or her conduct." *Id.* (quoting *Anderson*, 483 U.S. at 641).

When defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), dismissal is not appropriate unless the court can determine, based on the complaint itself, that qualified immunity applies. *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)). While courts may consider qualified immunity at the pleadings stage, the Ninth Circuit has noted that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (citing *Kwai Fun Wong v. United States*, 373 F.3d 952, 956–57 (9th Cir. 2004)). The Ninth Circuit has also observed that, by considering qualified immunity at the pleadings stage, "the courts may be called upon to decide far-reaching constitutional questions on a nonexistent factual record." *Kwai Fun Wong*, 373 F.3d at 957. In considering qualified immunity, the court must accept the allegations in the plaintiff's complaint as true and construe them in the light most favorable to the plaintiff. *Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022).

### III. DISCUSSION

Plaintiff brought three Section 1983 claims against Social Worker Defendants in their individual capacities for allegedly placing Isaiah in foster homes and facilities with

inadequate supervision and treatment for his drug abuse and mental health problems. Plaintiff claims that by placing Isaiah in these foster placements, these defendants violated (1) Isaiah's right to safety, security, supervision, and care as a foster child; (2) his right to be free from state-created dangers; and (3) his right to a foster child "case plan" required by federal statutes. Social Worker Defendants argue that qualified immunity shields them from Section 1983 liability for each of these claims because these rights were not clearly established in the law. The Court examines whether existing law clearly defined the contours of the above constitutional and statutory rights such that a reasonable social worker would have known that his or her conduct violated those rights.

### A. Qualified Immunity for Plaintiff's Special Relationship Claim (Claim 1)

Social Worker Defendants argue that qualified immunity shields them from Plaintiff's claim that they violated Isaiah's Fourteenth Amendment right to safety, security, and supervision as a foster child. The Fourteenth Amendment generally does not confer an affirmative right to governmental aid unless a "special relationship" exists between the state actors and the plaintiff. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). This special relationship exists when the state has a custodial relationship with the individual—for example, prisoners or children in state custody—such that the state assumes some responsibility for that person's safety and well-being. *See id.*; *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976) (establishing government's obligation to provide medical care for inmates); *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) (establishing government's affirmative duties to foster children in state custody). To determine whether qualified immunity protects officials acting within the context of a foster child relationship, a court should (1) "determine[] the contours of a foster child's clearly established rights . . . under the 'special relationship' doctrine of substantive due process" and (2) "examine[] whether a reasonable official would have understood that the specific conduct alleged by [the plaintiff] violated those rights." *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012).

> *1. A Foster Child's Clearly Established Rights Under the "Special Relationship" Doctrine*

The Ninth Circuit has clearly established that children in state custody have a Fourteenth Amendment due process right to safe placement, supervision, and protection by a social worker. When the state takes custody of a child, it must provide the child with "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (recognizing the state's affirmative duty to provide "basic human needs . . . [including] medical care and reasonable safety" to a person in its custody). In *Tamas*, the Ninth Circuit clearly established that a foster child's Fourteenth Amendment rights extended to the right to supervision, protection, and safe foster care placement by a social worker. 630 F.3d at 842. There, foster children brought Section 1983 claims against social workers who allegedly placed them with a foster parent who abused them and neglected to provide them with basic care. *Id.* at 837–41. For example, the foster parent allegedly left them alone at night and did not feed them. *Id.* The court denied the social workers' assertion of qualified immunity, holding that the foster children's right to safe foster care placement and proper supervision was clearly established. *Id.* at 847.

Two years after *Tamas*, the Ninth Circuit further expanded the contours of a foster child's clearly established rights to encompass the right to medical care. *Henry A.*, 678 F.3d at 1001. In *Henry A.*, social workers allegedly failed to provide a group of foster children with medical care. *Id.* at 996–998. The social workers did not transfer the foster children's medical records to their respective treatment providers: as a result, some of these children did not receive the appropriate medical treatment and suffered severe illnesses. *Id.* at 997. Specifically, one foster child received incorrect medication and was hospitalized with near organ failure because of the social workers' failure to provide his medical records. *Id.* Another foster child suffered from an impacted colon because the County neglected to authorize the necessary medical treatment, which caused treatment delays. *Id.*

These foster children brought Fourteenth Amendment claims alleging failure to adequately provide medical and mental health services. *Id.* at 998. The Ninth Circuit held that social workers violate a foster child's right to adequate safety and medical care when they are deliberately indifferent to a child's serious medical needs such as failing to provide necessary medication or facilitate medical treatments. *Id.* at 1000; *see also Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) (holding that failure to supervise foster child's asthma violated the state's clearly established "obligation to provide adequate medical care, protection and supervision [to foster children]").

Moreover, the body of case law surrounding the rights of prisoners establishes that constitutional rights of people in state custody extend to medical care, supervision, and monitoring to prevent medical harm. In defining the contours of the rights of children in state custody, the Ninth Circuit court in *Henry A* held that "the substantive due process rights of foster children are analogous to those of prisoners"; therefore, the court "can also look to [its] prisoner cases to further define what constitutes a 'serious medical need.'" 678 F.3d at 1001. Looking to Ninth Circuit prisoner cases, this Court finds that the law has clearly established that individuals in state custody have the right to monitoring and protection from their own self-harming tendencies due to mental health and medical problems. *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 678–679 (9th Cir. 2021) (failure to monitor detainee who suffered from drug overdose constituted deliberate indifference to serious medical need); *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082–1083 (9th Cir. 2013) (failure to monitor inmate with mental health problems and perform CPR after his suicide attempt constituted deliberate indifference to serious medical need). In *Sandoval*, a person detained in a county jail died from a methamphetamine overdose after jail staff left him unmonitored for eight hours, despite signs that he was under the influence of drugs. 985 F.3d at 662. The Ninth Circuit denied qualified immunity for the jail staff, finding that a reasonable official would have understood that "failing to check on [the inmate] for hours . . . presented such a substantial risk of harm to [the inmate] that the failure to act was unconstitutional." 985 F.3d at 678 (internal quotations omitted). In

*Lemire*, a mentally ill inmate died by suicide after jail staff left him unmonitored for an extended period of time. 726 F.3d at 1076. The court denied summary judgment on the grounds that the lack of monitoring and supervision "posed a substantial risk that some inmate would come to harm, either self-inflicted or otherwise[.]" *Id*. These Ninth Circuit cases, among others, clearly establish that foster children's rights to safe placement, supervision, protection, and adequate medical care set forth in the *Tamas* and *Henry A* cases also extend to appropriate monitoring and supervision to prevent serious self-inflicted harm.

> 2. *Alleged Conduct Violated Clearly Established Rights Under the Special Relationship Doctrine*

Having determined the contours of a foster child's Fourteenth Amendment rights, the Court next examines Plaintiff's allegations to determine whether a reasonable social worker would know that his or her conduct surrounding Isaiah's care violated these rights. Based on the allegations, the Court finds that reasonable officers in the shoes of Social Worker Defendants would have known that placing Isaiah in the foster placements described above violated those rights. With regard to Isaiah's placement with the first foster parent, Plaintiff alleges that Ms. Gorospe and Ms. Pearson were aware that Isaiah had previously overdosed on drugs, had a history of running away, and required drug treatment and mental health services. FAC ¶¶ 85–86. Despite this knowledge, these defendants failed to provide Isaiah with such medical treatment and supervision and instead placed him with an ill-equipped foster parent. *Id*. ¶ 87. A reasonable social worker would have understood that failing to place Isaiah in a facility with adequate mental health treatment and supervision despite knowledge of his serious drug abuse and mental health problems amounted to deliberate indifference to a serious medical need.

With regard to Isaiah's placement at Circle of Friends and then the Henderson home, Plaintiff alleges that Ms. Cibrian and Mr. Ruff were aware of Isaiah's history of substance abuse and need for mental health and drug treatment. *Id*. ¶¶ 93–96. Despite this knowledge, these defendants placed him at Circle of Friends, which they knew had

inadequate treatment for drug abuse and poor supervision and monitoring. *Id.* Ms. Cibrian and Mr. Ruff also arranged for Isaiah to stay at the Henderson home, even though they knew that Harley had used drugs with Isaiah, the Henderson home was a "drug house," and 20-year-old Harley would be Isaiah's primary caretaker. *Id.* ¶¶ 102–107. A reasonable social worker would have understood that failing to provide Isaiah with proper monitoring and mental health and drug treatment despite his drug abuse problems would constitute deliberate indifference to Isaiah's right to safety in his foster care placements.

Finally, with regard to Isaiah's second Circle of Friend's placement, Plaintiff alleges that Ms. Watson and Ms. Neimann placed Isaiah back at Circle of Friends even though they knew that Isaiah did not get the intensive monitoring and drug and mental health treatment that he needed during his previous stay. *Id.* ¶ 114. Plaintiff alleges that these defendants knew Isaiah used drugs, did not get adequate drug and mental health treatment, and his mental illness, substance abuse, and behavioral issues had substantially worsened during his previous stay. *Id.* ¶¶ 114–115. Based on these allegations, a reasonable social worker would have recognized that the failure to provide Isaiah with the supervision, monitoring, and drug treatment that he required would violate his clearly established rights to such monitoring to prevent his self-destructive behaviors.

Accepting as true all factual allegations in the complaint, Plaintiff has alleged that Social Worker Defendants reasonably knew of the substantial risks of placing Isaiah without proper mental health and drug treatment, yet still chose to do so in deliberate indifference to Isaiah's clearly established right to adequate supervision and medical care while in state custody. Based on these allegations and the clearly established law, a reasonable social worker would have understood they were violating Isaiah's constitutional rights. Social Worker Defendants are therefore not entitled to qualified immunity on Claim 1.

**B. Qualified Immunity for Plaintiff's State-Created Danger Claim (Claim 2)**

Social Worker Defendants also argue qualified immunity shields them from Plaintiff's claim that they violated Isaiah's Fourteenth Amendment right to be free from

state-created dangers. Under this danger creation theory, a state is liable under the Fourteenth Amendment when "the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known and obvious danger." *Patel*, 648 F.3d at 971–972 (quotations omitted). To state a substantive due process claim based on a state-created danger, a plaintiff must establish three elements: (1) "that the officers' affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced"; (2) "that the injury she suffered was foreseeable"; and (3) "that the officers were deliberately indifferent to the known danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). Deliberate indifference requires that the official "knows that something is going to happen but ignores the risk and exposes [the plaintiff] to it." *Patel*, 648 F.3d at 974 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

*1. A Foster Child's Clearly Established Rights Under the "State-Created Danger" Doctrine*

The Ninth Circuit law on the "state-created danger" doctrine makes clear that social workers cannot place foster children where they will meet affirmative dangers such as an abusive foster parent. *Tamas*, 630 F.3d at 843–44; *Henry A*, 678 F.3d at 1002. In *Tamas*, social workers allegedly placed the foster children with a foster parent who physically and sexually abused them. 630 F.3d at 843–44. Similarly, in *Henry A.*, social workers allegedly placed the foster children in foster homes that had a known history of chronic neglect and abuse. 678 F.3d at 1002. The *Henry A.* court held that a foster child's rights under the state-created danger doctrine were clearly established in cases where a social worker placed a foster child in a home with a known danger of abuse. *Id.*

Contrary to Plaintiff's argument, the Court finds no clear authority extending the state created danger doctrine to situations where a state official failed to provide necessary care or prevent a child's own self-destructive behaviors, as opposed to affirmatively exposing the child to a third-party danger. Plaintiff has not pointed to any case which has clearly established under a state-created danger theory that a social worker could be liable to a foster child who suffered from a lack of monitoring and medical treatment in a foster

care placement.³  The only Ninth Circuit cases clearly holding social workers accountable under a state-created danger doctrine arise in contexts where a social worker placed the child with an abusive or dangerous foster parent.  *Tamas*, 630 F.3d at 843–44; *Henry A*, 678 F.3d at 1002.  Ninth Circuit case law therefore does not clearly establish that the state created danger doctrine encompasses passively failing to provide the correct level of medical care and monitoring as opposed to exposing children to affirmative dangers that they otherwise would not have faced.

> *2. Alleged Conduct Does Not Violate Clearly Established Rights Under the State-Created Danger Doctrine*

Having determined the contours of clearly established rights of foster children under the state-created danger doctrine, the Court next examines Plaintiff's allegations to determine whether a reasonable social worker would know that his or her conduct surrounding Isaiah's care violated these rights.  As described above, Plaintiff alleges that Social Worker Defendants failed to placed Isaiah in foster homes and facilities that could provide him with the level of supervision and treatment that he required for his mental health and drug abuse problems.  FAC ¶¶ 86–89, 97–100, 108–111.  Plaintiff does not allege that Social Worker Defendants placed him with an abusive or dangerous foster parent or another affirmative, external source of danger that he would not have faced if it were not for that placement.  Here, the dangers besetting Isaiah—his mental health condition and drug addiction problem—did not come from the placement: they came from his own self-destructive behaviors.  Under these circumstances, a reasonable social worker would not have understood that failing to provide Isaiah with placements that fully met his needs was tantamount to subjecting him to an affirmative, external danger.  Because the law does not clearly extend liability for state-created dangers to such failures to treat,

---

³ Plaintiff points only to *Henry A.* and *Tamas* in her briefing as sources of clearly established law to overcome Social Worker Defendants' assertion of qualified immunity.  *See Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989) (noting that plaintiff carries the burden to identify clearly established law).

supervise, and protect a foster child from himself, a reasonable social worker would not have known that his or her conduct violated a right under a state-created danger theory. *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (holding that qualified immunity applies if no clearly established law exists on the issue); *see also White*, 580 U.S. at 79 (noting that clearly established law must be "particularized" to the facts of the case). Social Worker Defendants are therefore entitled to qualified immunity on Claim 2.

**C. Qualified Immunity for Plaintiff's Federal Statutory Rights Claim (Claim 3)**

Finally, Social Worker Defendants assert qualified immunity for Plaintiff's claim that they violated the Adoption Assistance and Child Welfare Act of 1980 by failing to incorporate adequate mental health services and drug treatment protocols into Isaiah's case plan. In support of their assertion, Social Worker Defendants argue that existing law does not clearly establish that case plans need to incorporate specific mental health and drug treatment protocols.

*1. A Foster Child's Clearly Established Rights to a Case Plan*

In 1980, Congress amended the Social Security Act to enact the Adoption Assistance and Child Welfare Act of 1980 (the "CWA"), which required state foster care systems to meet certain minimum conditions to qualify for federal funds. 42 U.S.C. §§ 621, 670. As relevant here, the state is required to develop a "case plan" for each foster child pursuant to the CWA's "case plan provisions." *See* 42 U.S.C. §§ 671(a)(16) and 675(1). The statute defines a case plan as a written document that describes the type of placement, the appropriateness of the placement, and how the state plans to carry out the placement of the child. 42 U.S.C. § 675(1). The plan must include the child's health and educational records, a description of the child's permanency plan, and a plan for ensuring the child's educational stability. 42 U.S.C. § 675(1); *Henry A.*, 678 F.3d at 1006. The case plan must generally ensure that the foster child receives "safe and proper care" to address the needs of the child while in foster care but does not otherwise specify what constitutes such safe and proper care. 42 U.S.C § 675(B).

Despite Plaintiff's assertion that the CWA requires a case plan to specify appropriate mental health and substance abuse protocols, the Court has not identified any case law that establishes that a case plan must contain this level of specificity. Neither the Ninth Circuit nor a consensus from other circuits has ruled that a foster child's right to a case plan under the CWA includes a certain degree or level of mental health and drug treatment. While Ninth Circuit law generally recognizes a foster child's right to have a case plan, it does not provide guidance on the particularities of the case plan. In *Henry A.*, foster children brought a Section 1983 claim premised on violations of the case plan provisions requiring the development of a case plan for a foster child. *Id.* at 1006. There, the Ninth Circuit found a violation of the CWA because some of the foster children did not receive a case plan at all. *Id.* Neither the Ninth Circuit nor other circuits have otherwise examined what specific treatments need to be included in a case plan to be compliant with the CWA. *Cf. California State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 978–980 (9th Cir. 2010) (discussing rights guaranteed by non-case plan provisions of the CWA); *Lynch v. Dukakis*, 719 F.2d 504, 509 (1st Cir. 1983) (discussing rights to a case plan).

### 2. Alleged Conduct Does Not Violate Clearly Established Rights to a Case Plan

The Court examines Plaintiff's allegations to determine whether a reasonable social worker would know that his or her conduct violated the requirements of the CWA. In this case, Plaintiff does not allege that Isaiah received no case plan under the CWA. Instead, she alleges that Social Worker Defendants violated the CWA by failing to provide a case plan with appropriate services for his needs such as mental health and drug treatment. FAC ¶ 193. Because binding case law does not clearly establish that such a failure violates the CWA's case plan requirements, a reasonable social worker would not have known that providing Isaiah with a case plan that does not specify adequate mental health and drug treatment plans would have violated his rights under the CWA. Social Worker Defendants are therefore entitled to qualified immunity on Claim 3.

///

///

## IV. CONCLUSION

For the reasons discussed above, the Court DENIES Defendants Evelyn Gorospe, Ariel Pearson, Natania Cibrian, Thomas Ruff, Kymberlee Watson, and Kirstin Niemann's motion to dismiss on the basis of qualified immunity as to Claim 1 and GRANTS the motion as to Claims 2–3 [Dkt. 24].

**IT IS SO ORDERED**.

Dated:  June 16, 2023

_____
Honorable Jinsook Ohta
United States District Judge